## BAUSCH & LOMB OPTICAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53976. Filed June 13, 1958.

*Hugh Satterlee, Esq.*, and *Thomas C. Taylor, Esq.*, for the petitioner. *James E. Markham, Esq.*, for the respondent.

The Commissioner determined a deficiency in income tax for the taxable year 1950 in the amount of $90,223.10. Under section 272 (e), 1939 Code, he has made claim for increase in the deficiency in the amount of $5,833.83.

The main issues arise out of the Commissioner's determination that in 1950 petitioner realized long-term capital gain in the amount of $354,419.10 upon the liquidation of Riggs Optical Company—Consolidated in which petitioner owned stock. The chief questions are: (1) Whether there was a reorganization within the provisions of section

112 (g) (1) (C), 1939 Code. (2) In the alternative, whether petitioner owned at least 80 per cent of the voting stock of Riggs and, therefore, under section 112 (b) (6) did not realize any gain upon distribution of property in complete liquidation of Riggs. If the first question is decided for petitioner, there is another question, whether under sections 23 (s) and 122 (b) (2) (B) petitioner is entitled to carry over and deduct $27,703.22, which represents Riggs' net operating loss for the period in 1950 preceding the transfer of all of its assets to petitioner and its liquidation.

### FINDINGS OF FACT.

Bausch & Lomb Optical Company, hereinafter called petitioner, is a New York corporation having its principal office in Rochester, New York. It filed its return for 1950 with the collector of internal revenue for the twenty-eighth district of New York.

Petitioner was founded in 1853 by John Bausch and Henry Lomb, German immigrants. Its business originally was the making of ophthalmic products and spectacle lenses and frames. Its business was expanded to include the manufacture of scientific optical equipment and special types of military equipment.

The authorized stock of petitioner consists of 60,000 shares of 4 per cent cumulative preferred stock with a par value of $100 per share, and 762,500 shares of voting common stock with a par value of $10 per share. As of March 1, 1950, 50,000 shares of preferred stock and 582,227 shares of common stock were outstanding.

Riggs Optical Company—Consolidated, hereinafter called Riggs, was organized in 1922 under the laws of Delaware. As of December 31, 1947, petitioner owned 77.71 per cent of the voting stock of Riggs. In 1949, the only outstanding stock of Riggs was voting common stock having a par value of $100 per share of which 20,000 shares were authorized. At the end of 1949 and on March 1, 1950, the outstanding stock of Riggs amounted to 12,412 shares of which petitioner owned 9,923¼ shares and minority stockholders owned 2,488¾ shares. Petitioner had acquired all of its stock in Riggs prior to 1949. The 9,923¼ shares of Riggs' stock owned by petitioner constituted 79.9488 per cent of the 12,412 shares outstanding as of March 1, 1950.

In the fall of 1949 and the early part of 1950, there were discussions between the directors of petitioner and Riggs relating to the amalgamation of Riggs with petitioner which was to involve the transfer of all of Riggs's assets, subject to liabilities, to petitioner in exchange for petitioner's voting common stock. These discussions culminated in a proposal by petitioner to Riggs that, subject to the authorization of Riggs's stockholders, Riggs would convey all of its properties and assets to petitioner and would be liquidated. Petitioner would deliver

to Riggs 105,941 shares of its voting common stock, would assume liabilities of Riggs, would pay the costs of the proposed exchange and liquidation of Riggs, and would continue Riggs's business as well as its own. The proposal was referred to by petitioner's directors as a reorganization plan, and it was presented to petitioner's directors at a regular meeting of the board of directors on February 28, 1950. At this meeting, according to the minutes, petitioner's treasurer stated that "it was expected that each stockholder of Riggs would receive, upon the complete liquidation of said corporation which would follow such exchange, 8½ shares of the voting common stock of this corporation [Bausch & Lomb] in respect of each share of the capital stock of Riggs." At this meeting of petitioner's directors a resolution was duly adopted approving the proposed reorganization plan and agreement, which was set forth in a proposal letter dated March 1, 1950, addressed by petitioner to Riggs and bearing at the end thereof a form of acceptance to be signed by Riggs; and authorization was given to officers of petitioner to vote the shares of Riggs owned by petitioner in favor of the proposed exchange of Riggs's assets for stock of Bausch & Lomb. Also, authorization was given, *inter alia*, to officers of petitioner to cause to be issued to Riggs 105,941 shares of the unissued stock of Bausch & Lomb (after the proposed plan had been authorized and approved by Riggs's stockholders, and at the closing) against the receipt by Bausch & Lomb of the assets of Riggs.

The letter of petitioner to Riggs setting forth the proposed plan and agreement dated March 1, 1950, is set forth hereinafter.

In February 1950, during the course of the consideration of preliminary matters by the directors and officers of Riggs, they advised 16 of their key employees about the proposed consolidation of the business of Riggs with that of Bausch & Lomb because with the 16 employees there were outstanding individual agreements under which each of those employees had been receiving credits of various amounts from Riggs for application to the purchase price of Riggs' stock which was held in Riggs's treasury and had not yet been issued to any of the employees. Riggs's officers desired to work out an arrangement with this group of employees whereby they would receive benefit from the accounts on Riggs's books in their names in which the group had been credited over several years prior to 1950 with amounts which totaled, as of January 24, 1950, the sum of $5,669.29.

At various times from the middle of 1940 until the middle of 1946, Riggs had entered into the memorandum stock purchase agreements referred to above with 16 employees. Riggs offered stock to key employees because of their then active employment in positions of trust, and in consideration of continuation of such employment. Each employee made certain covenants with Riggs in consideration of the agreement. The employees were given the opportunity to acquire

Riggs' stock without any personal liability. Payment for the stock was to be made solely out of Riggs's earnings based on dividends paid on its common stock. The agreements were to represent incentives to the employees in the performance of their services to Riggs. Provision was made for settlement in the event of an employee's death, retirement, or termination of employment, and except for such contingencies no employee was to receive the stock covered by an agreement until total credits to the employee equaled the total purchase price of the stock covered by the contract. The memorandum of agreement of Riggs with the 16 employees provided, in general, that the purpose was to provide for the acquisition of a stated number of shares of common stock of Riggs, "with the assistance of Riggs," which were held in Riggs's treasury, "for transfer and delivery to the Employee upon fulfillment of the terms of payment herein provided"; and that the aggregate purchase price was to be paid as follows:

Whenever cash dividends are declared and paid on the common stock of Riggs, Riggs will credit an account to be maintained on its books in favor of the Employee with an amount equal to such cash dividends on the number of shares reserved hereunder. All such credits shall constitute compensation for services in addition to the Employee's regular compensation paid by Riggs.

    \*      \*      \*      \*      \*      \*      \*

Interest shall be deducted from credits made to the account of the Employee on the unpaid balance of said aggregate price at a rate not in excess of six per cent (6%) per annum, as determined by Riggs, and in an amount not exceeding total credits, if any, made as aforesaid to the Employee's account in any calendar year.

Riggs will not look to the Employee personally, nor endeavor to hold him personally liable, for any payments on account of said aggregate price or interest on the unpaid balance thereof.

When the aggregate net credits to the account of the Employee shall equal the aggregate purchase price herein before specified, Riggs will transfer and deliver to the Employee all stock then reserved hereunder, including additional shares, if any, reserved by reason of the payment of stock dividends.

The agreement also provided as follows:

The Employee agrees that in case the business of Riggs, or any branch or division thereof with which he may then be directly connected, shall be sold to any other corporation, or in case Riggs shall reorganize, recapitalize or otherwise change its corporate entity, Riggs or such purchaser or successor corporation or new entity shall have the right to assume this contract, substituting in place of the stock originally reserved hereunder such number of shares of stock of such recapitalized, reorganized, new or successor corporation as shall, at the time of the substitution thereof, have an aggregate book value equal to the aggregate price of the stock previously reserved hereunder.

By letters dated February 14, 1950, to each of the 16 employees, Riggs requested each to consent to the termination of his agreement, described above, and to accept shares of common stock of Bausch & Lomb at the rate of 8½ shares in lieu of each share of common stock of Riggs for which the then credits entitled each employee, plus cash

for credits in a lesser amount than required to pay for 1 share of Riggs' stock under the agreements. Each was advised of the total amount credited toward the purchase of Riggs' stock; of the number of fully paid shares of Riggs' stock for which the total credits to date paid; the amount, if any, of the balance of such credits over and above the amount which paid for the stated number of Riggs' shares; and how many shares of Bausch & Lomb stock the employee would receive in lieu of the fully paid shares of Riggs' stock on the basis of $8\frac{1}{2}$ shares of Bausch & Lomb stock for 1 share of Riggs. For example: In the case of one employee, W. H. Vickery, the original stock purchase agreement which he entered into on June 11, 1943, called for his acquisition of 15 shares of Riggs' stock at $105.33 per share, or $1,580. He was advised on February 14, 1950, that $514.44 had been credited to his account by Riggs; that said amount would pay for 4 shares of Riggs and leave a balance due him of $93.12; and that, if he agreed, he would receive 34 shares of common stock of Bausch & Lomb plus $93.12, provided the proposed transaction with Bausch & Lomb was actually closed.

The following schedule shows that as of January 24, 1950, 12 out of the 16 employees had received credits which would pay for 1 or more shares of Riggs stock under the respective agreements, but less than the total number subscribed for, and provide, in addition, a cash payment. The schedule shows, also, how many shares of common stock of Bausch & Lomb each could receive in the place of the fully paid shares of Riggs' stock.

| Names of Riggs's employees | Original number shares of Riggs per contract and price | | Credits by Riggs to Jan. 24, 1950 | Riggs shares to be issued for credits | To be paid to employee by B. & L. | B. & L. stock to be issued |
|---|---|---|---|---|---|---|
| Aitkenhead | 15 | $1,400.00 | $1,057.79 | 11 | $25.67 | 94 |
| Albin | 10 | 1,140.00 | 114.39 | 1 | 7.10 | 8 |
| Crone | 10 | 1,140.00 | 114.39 | 1 | 7.10 | 8 |
| Erpelding | 15 | 1,400.00 | 1,036.60 | 11 | 4.48 | 94 |
| Henry | 10 | 1,140.00 | 114.39 | 1 | 7.10 | 8 |
| Marcotte | 10 | 1,140.00 | 114.39 | 1 | 7.10 | 8 |
| Mastrogany | 15 | 1,580.00 | 514.43 | 4 | 93.11 | 34 |
| Sandoz | 10 | 1,095.00 | 177.00 | 1 | 61.06 | 9 |
| Smith | 10 | 1,140.00 | 114.39 | 1 | 7.10 | 8 |
| Stoppel | 15 | 1,580.00 | 520.89 | 4 | 99.57 | 34 |
| Vavra | 15 | 1,400.00 | 1,056.88 | 11 | 24.76 | 94 |
| Vickery | 15 | 1,580.00 | 514.44 | 4 | 93.12 | 34 |
| Anderegg | 10 | 1,161.60 | 33.38 | 0 | 33.38 | 0 |
| Kyle | 10 | 1,161.60 | 44.90 | 0 | 44.90 | 0 |
| Oden | 10 | 1,140.00 | 96.13 | 0 | 96.13 | 0 |
| Shockley | 10 | 1,161.60 | 44.90 | 0 | 44.90 | 0 |
| | 190 | 20,359.80 | 5,669.29 | 51 | 656.58 | 433 |

The letter to each of the employees having a stock purchase contract provided, in part, as follows:

The long considered program for consolidating the business of our company with that of Bausch & Lomb Optical Company, of Rochester New York, is about ready to be presented to the Directors of our company for their consideration, and if approved by them then to the stockholders of our company in the

near future. It is proposed that this company will transfer its properties and business to Bausch & Lomb Optical Company in exchange for shares of Bausch & Lomb common stock. This company will then be liquidated and it is anticipated that each stockholder of this company will receive 8½ shares of Bausch & Lomb common stock for each share of stock of this company which he holds. The approval of the stockholders of this company is, of course, required but, before the special stockholders meeting is held, it seems advisable to determine how many shares of Bausch & Lomb's common stock will be necessary in order to settle the outstanding agreements with employees of this company for the purchase of shares of its common stock. We are, accordingly, proposing to all such employees that they agree to accept shares of the common stock of Bausch & Lomb Optical Company at the rate of 8½ shares for each fully paid share of stock of this company to which they are entitled under their contracts and to accept cash for any additional amount less than the purchase price of one full share of stock of this company.

   \*      \*      \*      \*      \*      \*      \*

We request your consent to the termination of your agreement, to become effective only if and when the proposed transaction with Bausch & Lomb Optical Company is actually closed and you have received the cash payment to which you are entitled and notice of the number of shares to be issued in your name. The shares of Bausch & Lomb stock will be issued within a short time after the transaction combining the two companies is closed.

We shall appreciate it if you will sign the agreement appearing at the foot of the enclosed copy of this letter and return the same to this office so as to reach here on or before February 24, 1950.

   \*      \*      \*      \*      \*      \*      \*

I hereby agree to the cancellation and termination of my stock purchase contract on the basis described in the foregoing letter to become effective if and when the properties and business of Riggs Optical Company-Consolidated are transferred to Bausch & Lomb Optical Company.

Dated:

(Signature of employee)

By February 24, 1950, all of the 16 employees of Riggs had given their written consent to the cancellation and termination of their original agreements to acquire Riggs' stock and to the proposal made in Riggs's letter of February 14 to receive Bausch & Lomb stock and cash, said consents to become effective when the assets of Riggs were transferred to Bausch & Lomb. Therefore, by February 24, Riggs knew that 12 employees, whose credits paid for 51 shares of Riggs' stock and provided a surplus of $437.27, in cash, would be entitled to receive 433 shares of Bausch & Lomb common stock; and that 4 employees whose credits were insufficient to pay for 1 share of Riggs' stock would receive only cash of $219.31, the total of the amounts of their respective credits. This information became known to the directors of Bausch & Lomb, and when they held their meeting on February 28, 1950 (referred to above), they knew that on the basis of 8½ shares of Bausch & Lomb stock for 1 share of Riggs' stock, the 105,941

shares of Bausch & Lomb stock referred to in the plan of reorganization would be distributed to the following groups under the plan:

| Shares of Bausch & Lomb stock | For Riggs stock | Group |
|---|---|---|
| 84, 347 | 9, 923¼ | Petitioner |
| 21, 161 | 2, 488¾ | Minority |
| 433 | [1] 51 | 12 employees |
| 105, 941 | 12, 463 | |

[1] Unissued but reserved stock.

The minutes of the meeting of the directors of Bausch & Lomb held on February 28, 1950, show that the president of Bausch & Lomb was given discretion to deliver (before the closing) to Riggs the certificates for 9,923¼ shares of Riggs' stock owned by Bausch & Lomb with a waiver of the right to receive any of Riggs's assets which, except for the waiver, would be distributable with respect to said 9,923¼ shares of Riggs' stock upon the dissolution of Riggs, and, in such event, 21,594 shares of Bausch & Lomb common stock, in lieu of 105,941 shares, would be delivered at the closing for all of Riggs's assets. On the basis of exchange of 8½ shares of Bausch & Lomb stock for 1 share of Riggs' stock, 21,594 shares of Bausch & Lomb stock would take care of 2,488¾ shares of Riggs' stock owned by minority stockholders, plus the 51 shares of fully paid but unissued shares of Riggs' stock to which 12 employees were entitled. The president of Bausch & Lomb did not exercise the discretion provided for, as above described.

The proposal of Bausch & Lomb for the acquisition of Riggs's assets and its dissolution set forth in the letter agreement dated March 1, 1950, stated that there were 12,412 shares of common stock of Riggs outstanding, and that certain employees who held contracts permitting them to purchase Riggs' stock had agreed that in case a reorganization was consummated they would accept in full settlement of all of their claims for Riggs' stock 433 shares of common stock of Bausch & Lomb and $656.58 in cash. The proposed agreement provided, further, that it would become effective upon approval of a majority of Riggs's stockholders; that the closing date would be April 22, 1950; and that reasonably promptly after the closing the shares of stock of Bausch & Lomb would be distributed to Riggs's stockholders as a distribution in liquidation, and that Riggs would then be dissolved.

On March 27, 1950, Riggs's directors met and discussed the proposed plan of reorganization. It was their understanding that 105,941 shares of Bausch & Lomb stock were to be given in exchange for all of the assets of Riggs, subject to liabilities. Riggs's directors approved the plan, and on March 27, 1950, Riggs's acceptance of the plan and agreement was executed at the end of the letter agreement.

At a meeting of the directors of Bausch & Lomb on March 30, 1950, the president or other officer was authorized to issue from the 105,941 shares of Bausch & Lomb stock, if so requested by Riggs, 433 shares directly to employees of Riggs "holding stock purchase contracts."

On April 7, 1950, the stockholders of Riggs, at a special meeting, approved the plan and agreement dated March 1, 1950; they ratified the acceptance thereof by Riggs's directors on March 27; and they consented to the transfer of all of Riggs's assets to Bausch & Lomb in exchange for 105,941 shares of Bausch & Lomb stock. They understood that following the closing on April 22, 1950, Riggs would be dissolved and that in the liquidation distribution Riggs's stockholders would receive 8½ shares of Bausch & Lomb stock for 1 share of Riggs.

Following the stockholders' meeting, a special meeting of Riggs's directors was held on April 7, 1950, at which a resolution was adopted to dissolve Riggs after the closing on April 22, and consideration was given to the matter of distributing the assets of Riggs, which would then be held, to Riggs's stockholders. In connection with the latter matter, the president of Riggs reported that employees of Riggs holding employees' stock purchase contracts had agreed to accept 433 shares of Bausch & Lomb stock and $656.58 in cash "in full payment of their credits" under the stock purchase contracts, and that payment of the $656.58 in cash would be made by Bausch & Lomb. The president of Riggs was authorized to request Bausch & Lomb to issue 433 shares of Bausch & Lomb stock at the time of the closing on April 22, 1950, directly in the names of the 12 employees of Riggs who had agreed to accept the Bausch & Lomb stock. The president then stated that the assets of Riggs after the closing would consist of 105,508 shares of Bausch & Lomb stock, after excluding the 433 shares, and that—

the assumption by Bausch & Lomb Optical Company of the liabilities of this Company and the expense of its dissolution and final liquidation made it possible *to distribute all such shares of Bausch & Lomb Optical Company to the stockholders of this Company and to the employees holding the above described Stock Purchase Contracts, in complete and final liquidation of this Company.* [Emphasis supplied.]

The directors of Riggs at the above meeting on April 7, 1950, adopted resolutions which authorized the proper officers, upon completion of the exchange of Riggs's assets on April 22, 1950, (1) to distribute 433 shares of Bausch & Lomb stock to the 12 employees of Riggs, and (2) to distribute the 105,508 shares of Bausch & Lomb stock to the stockholders of Riggs of record (on the date when the stockholders should vote for Riggs's dissolution) holding 12,412 shares of Riggs' stock on the basis of 8½ shares of Bausch & Lomb stock for 1 share of Riggs in complete liquidation of Riggs.

The agreement between petitioner and Riggs dated March 1, 1950, is as follows, except for some provisions which are not material in considering the issues involved here and which are not set forth:

March 1, 1950

RIGGS OPTICAL COMPANY–CONSOLIDATED,
    *18 South Michigan Avenue,*
        *Chicago, Illinois.*

DEAR SIRS: Your company is engaged in the distribution of ophthalmic products, a substantial portion being of our manufacture, and our company is engaged in the manufacture and distribution of ophthalmic products. For some time conditions generally prevailing in the industry have made it increasingly difficult to operate profitably. A series of conferences have resulted in agreement by the directors of both companies upon a · plan of reorganization involving the exchange of all the properties and assets of your company for shares of the voting common stock of our company, the assumption by our company of the liabilities of your company, the continuation by our company of the business of both companies, and the distribution to your stockholders, in complete liquidation of your company, of the voting common stock of our company received in exchange for your properties and assets. It is felt that your stockholders will benefit through the continuation of the business of your company by a larger company engaged in both manufacture and distribution and that the stockholders of both companies will benefit through the resulting operating economies and increased efficiency. With a view to obtaining these benefits for the stockholders of both companies, the undersigned, Bausch & Lomb Optical Company (hereinafter called "Bausch & Lomb"), hereby makes the following proposal to your company (hereinafter called "Riggs") :

*1. Representations of Bausch & Lomb*

Bausch & Lomb represents and warrants as follows:

(a) That it is a corporation organized and existing under and by virtue of the laws of the State of New York and having its principal office in the City of Rochester, New York;

(b) That it is authorized to issue 60,000 shares of 4% Cumulative Preferred Stock of the par value of $100 per share and 762,500 shares of Common Stock of the par value of $10 per share; that there are issued and outstanding on *Purchased Contracts, in complete and final liquidation of this Company.* [Emphasis supplied.]

\*          \*          \*          \*          \*          \*          \*

*2. Representations of Riggs*

Riggs, by its acceptance hereof, represents and warrants:

(a) That it is a corporation organized and existing under and by virtue of the laws of the State of Delaware and having its principal office in the City of Wilmington, Delaware;

(b) That it is authorized to issue 20,000 shares of capital stock of the par value of $100 per share; that there are issued and outstanding on this date 12,412 shares of said stock; that sixteen employees, who hold contracts permitting them to purchase a total of 190 shares of capital stock of Riggs, have agreed that in case the Reorganization Plan is consummated they will accept, in full settlement of all claims to shares of the capital stock of Riggs and/or cash, to which they would otherwise be entitled by reason of the amounts outstanding to their credit under such contracts, a total of 433 shares of voting common stock of Bausch & Lomb and a total of $656.58 in cash.

\*          \*          \*          \*          \*          \*          \*

*3. Terms of Exchange*

In pursuance of said Reorganization Plan it is mutually agreed:

(a) That Riggs shall convey and transfer to Bausch & Lomb all its properties and assets and that Bausch & Lomb in exchange therefor, (1) shall issue and deliver to Riggs 105,941 fully paid and nonassessable shares of the voting common stock of Bausch & Lomb (provided that the number of said shares may be reduced by the delivery to Riggs of waivers of the rights of the owners and holders of 9923¼ shares of the capital stock of Riggs now owned by Bausch & Lomb, to receive, upon dissolution of Riggs, any moneys or assets which, except for such waivers, would be payable or distributable with respect to Riggs stock, together with the certificates representing such stock), (2) shall continue the business of both companies, and (3) shall assume and pay all the liabilities of Riggs disclosed in said balance sheet of Riggs as at December 24, 1949 (to the extent not paid by Riggs prior to the closing) and all additional liabilities incurred by Riggs in the ordinary course of business, and not otherwise, between December 24, 1949 and the actual closing hereunder, and the costs of the proposed exchange and subsequent liquidation of Riggs;

(b) That, reasonably promptly after the closing hereunder, the said shares of common stock of Bausch & Lomb will be distributed to Riggs stockholders as a distribution in liquidation and, subject to approval of its stockholders, that Riggs shall be dissolved.

*4. Approval by Riggs stockholders*

Riggs agrees to present said Reorganization Plan to its stockholders at a stockholders meeting called for that purpose as soon as reasonably practicable, and it is mutually understood and agreed that this agreement is subject to and shall become effective and binding only upon its formal approval by stockholders of Riggs holding at least a majority of its outstanding shares of capital stock.

*5. Closing*

The transaction herein contemplated shall be closed at the office of Bausch & Lomb, 635 St. Paul Street, in the City of Rochester, New York, on the 22nd day of April, 1950, at ten o'clock in the forenoon.

If the foregoing correctly sets forth your understanding, please so indicate in the space provided below for the purpose, whereupon this letter and your acceptance, when approved as stated above, shall constitute a binding agreement between us.

BAUSCH & LOMB OPTICAL COMPANY

(Seal)      By Joseph F. Taylor

*President*

ATTEST:

W. W. McQuilkin

     *Secretary*

     ACCEPTED March 27th, 1950.

RIGGS OPTICAL COMPANY–CONSOLIDATED

(Seal)      By J. E. Bohle

*President*

ATTEST:

L. N. Wicklund

     *Secretary*

On April 22, 1950, the agreement was closed. Riggs delivered a conveyance of all of its assets to petitioner, and petitioner delivered certificates for 105,941 shares of Bausch & Lomb stock to Riggs, 1 certificate being issued to Riggs for 105,508 shares, and other certificates

covering 433 shares being made to each of the 12 employees of Riggs. United States and New York stock transfer taxes were paid on all of the 105,941 shares of Bausch & Lomb stock.

On May 2, 1950, Riggs's stockholders voted to dissolve Riggs. It was reported at this meeting that there were 12,412 shares of Riggs' common stock outstanding. Thereafter a certificate of dissolution was filed with the secretary of state of Delaware. The 105,508 shares of Bausch & Lomb stock were distributed as a liquidating distribution to the holders of 12,412 shares of Riggs' stock; petitioner received 84,347 shares, and the minority stockholders (exclusive of the 12 employees) received 21,161 shares.

Petitioner retained in its treasury the 84,347 shares of its own stock which it received upon the liquidation of Riggs. No sales of this treasury stock were made until 1954 when 1,220 shares were sold to petitioner's employees. In 1955, petitioner sold 3,139 shares, and in 1956, 2,750 shares. The remaining 77,238 shares are still held as treasury stock.

Each of the employees of Riggs who held the stock purchase contracts referred to above became employees of petitioner after Riggs was dissolved.

None of the employees of Riggs who held a contract to acquire stock of Riggs ever made any assignment to petitioner of his rights and claims under such contract. No stock of Riggs was ever issued and delivered to an employee under the stock purchase contracts, or pursuant to the consents which were executed by the employees under Riggs's letters to such employees dated February 14, 1950. The 51 shares of Riggs' stock which were fully paid for by credits as of February 14, 1950, were never issued and delivered to the 12 employees of Riggs, or to petitioner.

The Commissioner determined that upon the liquidation of Riggs, petitioner realized long-term capital gain in the amount of $354,419.10, 25 per cent of which was taken into account in determining the deficiency. His explanation of his determination in the statutory deficiency notice is as follows:

Long term gain of $354,419.10 resulting from absorption of Riggs Optical Company, Consolidated is included in taxable income. Since the absorbing of the Riggs Optical Co., Consolidated on April 21, 1950 by you does not constitute a reorganization under Section 112 (g) (1) (C) of the Internal Revenue Code [of 1939], a taxable gain or loss resulted to you upon liquidation of Riggs as provided in Section 115 (c) subject to the applicable limitations in Section 117 of the Internal Revenue Code. * * *

The Commissioner computed the amount of the capital gain, $354,-419.10, in the following way: He computed the net value of the assets of Riggs to be $1,749,206.05, and the value per share of the 12,412 shares of Riggs' stock to be $140.92862. On this basis, he determined that

upon liquidation of Riggs petitioner received for its 9,923¼ shares of Riggs' stock $1,398,469.93, from which he subtracted petitioner's cost of the stock, $1,044,050.83, and arrived at a gain of $354,419.10.

In its return for the taxable period ending December 31, 1950, petitioner deducted $27,703.22 as a net operating loss carryover from Riggs which sustained a net operating loss in that amount for the period January 1 to April 21, 1950, the period prior to petitioner's absorption of Riggs. For 1949, Riggs had a substantial net operating loss, also. Consistent with his determination above described, the respondent determined that petitioner was not entitled to any deduction for carryover of a net operating loss of Riggs.

The stipulated facts are found as stipulated. The stipulation and the attached exhibits are incorporated herein by this reference.

OPINION.

HARRON, *Judge:* The Commissioner has determined that the substance of the transaction with Riggs was that petitioner acquired the properties of Riggs in exchange in part for the 9,923¼ shares of Riggs' stock owned by petitioner and in part for stock in petitioner, and that, therefore, the gain which petitioner realized in liquidation of its investment in Riggs is subject to tax. Respondent's determination rejects the contention of the petitioner that there was a nontaxable reorganization under section 112 (b) (3), 1939 Code, within the definition of reorganization in section 112 (g) (1) (C).[1]

The petitioner contends that it acquired Riggs's assets in exchange solely for part of its voting stock, and that it gave up its Riggs' stock to acquire 84,347 shares of its own stock. Under petitioner's view of the facts, there was compliance with the requirements of section 112 (g) (1) (C). Petitioner relies on *Helvering* v. *Winston Bros. Co.*, 76 F. 2d 381.

The chief question is whether the transaction was a reorganization within the provisions of section 112 (g) (1) (C). The solution of

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\* \* \* \* \* \* \*

(g) DEFINITION OF REORGANIZATION.—

\* \* \* \* \* \* \*

(1) The term "reorganization" means \* \* \* (C) the acquisition by one corporation, in exchange *solely* for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded \* \* \* [Emphasis supplied.]

the problem presented involves interpreting both the statutory language and the facts.

The leading case of *Helvering* v. *Southwest Consol. Corporation*, 315 U. S. 194, gives us the decisive interpretation of section 112 (g) (1) (C), as follows:

Congress has provided that the assets of the transferor corporation must be acquired "solely" for "voting stock" of the transferee. "Solely" leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement.

See also *Howard* v. *Commissioner*, 238 F. 2d 943, 946, reversing 24 T. C. 792.

Petitioner, in our opinion, does not take a contrary view of the requirements of section 112 (g) (1) (C). In fact, petitioner argues that the properties of Riggs were acquired in exchange solely for petitioner's voting stock. The difficulty with petitioner's contention in this respect is that petitioner would have us treat as entirely separate transactions its delivery of 105,508 shares of its voting stock to Riggs in exchange for all of Riggs's properties, and the liquidating distribution by Riggs of the 105,508 shares of petitioner's stock to the holders of record of all of Riggs' outstanding stock under which distribution petitioner received back 84,347 shares of its own stock upon surrender of the 9,923¼ shares of Riggs' stock which it owned. We cannot conclude that it is permissible to treat these two steps as separate transactions. We must and do find from all of the facts and circumstances that all of the steps taken were part of a single, integrated transaction, all the parts of which were interdependent. Cf. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179; *Gregory* v. *Helvering*, 293 U. S. 465; *Helvering* v. *Bashford*, 302 U. S. 454. The steps followed by petitioner and Riggs were mere "intermediate procedural devices utilized to" enable petitioner to acquire all of the assets of Riggs pursuant to a single plan. *Helvering* v. *Alabama Asphaltic Limestone Co.*, *supra*.

When the entire plan dated March 1, 1950, is considered, as well as the intent of both parties as is shown by the record, it is clear that it was contemplated as part of the plan from the outset, that the liquidation and dissolution of Riggs would follow immediately, or as soon as possible, upon the transfer of all of the properties of Riggs to petitioner. When the whole transaction is analyzed, it shows in our opinion that petitioner acquired the properties of Riggs in part for the Riggs' stock which petitioner owned, and in part for the 21,161 shares of petitioner's voting stock which was distributed to the minority stockholders of Riggs for their equitable interests in Riggs's

assets.[2] There was, therefore, a liquidation of petitioner's investment in Riggs. It would be improper in our opinion under the law, and would frustrate the limitations upon nontaxable reorganization which are embodied in the definition of the term "reorganization" in section 112 (g) (1) (C), to recognize here as a separate transaction petitioner's delivery of 105,508 shares of its voting common stock at the time Riggs gave petitioner the instrument of conveyance of all of its properties. Such view of what transpired would amount to elevating form above substance and allowing mere form to control the issue. We must, under all of the circumstances, recognize that petitioner controlled Riggs through its ownership of 79.9 per cent of Riggs' stock, and that petitioner's transfer of 84,347 shares of its own voting stock to Riggs was intended to be but a momentary parting with shares which were to be returned to petitioner immediately, for all practical purposes. It was not necessary for petitioner to transfer 84,347 shares of its own stock to Riggs in order to acquire all of Riggs's assets. Rather, this step represented an artifice which we are obliged to recognize for what it truly was. *Gregory* v. *Helvering, supra.*

It is concluded that the transfer to Riggs of 105,508 shares of petitioner's voting stock was not a separate transaction in which petitioner acquired all of Riggs's assets, and that under all of the facts petitioner did not acquire all of Riggs's properties solely in exchange for part of petitioner's voting stock. It is held that there was not a reorganization within the requirements of section 112 (g) (1) (C). It follows that there was not a nontaxable reorganization under the agreement between petitioner and Riggs dated March 1, 1950. Respondent's determination that petitioner realized taxable long-term gain under the transaction is sustained.

In the alternative, petitioner contends that it in substance acquired 51 additional shares of Riggs' stock from 12 employees of Riggs in exchange for 433 shares of its stock and cash, thereby increasing its holding of Riggs' stock to 80.03 per cent, and that, therefore, there was a nontaxable liquidation of Riggs within the requirements of section 112 (b) (6). This contention presents the question whether petitioner owned at least 80 per cent of Riggs' stock as is prescribed in section 112 (b) (6) (A).

Subsection (A) of section 112 (b) (6) provides that the corporation receiving property in complete liquidation of another corporation

[2] It is pointed out in our consideration of the second question, involving petitioner's alternative contention that in giving 12 of petitioner's employees 433 shares of petitioner's stock and cash, petitioner, in effect, was discharging a liability of Riggs to 16 employees, who had acquired certain rights under old, executory employees' stock purchase agreements, whose rights Riggs had settled (in contemplation of the transaction covered by its agreement of March 1, 1950, with petitioner) by obtaining the employees' consent to accept stock of petitioner and cash in lieu of stock of Riggs and to terminate the old employees' stock purchase agreements.

must have owned at least 80 per cent of the voting stock of the liquidated corporation on the date of the adoption of the plan of liquidation and at all times until the receipt of the property. After careful consideration of all of the facts it must be concluded that petitioner did not own at least 80 per cent of Riggs' voting common stock. The facts relating to this question have been set forth fully and in great detail in the Findings of Fact. A careful review of all of the relevant facts, many of which are located in the minutes of the meetings of the directors and stockholders of Riggs and of petitioner, respectively, shows that there is very little merit to petitioner's contention.

The record before us shows that 12 of Riggs's employees had received credits on Riggs's books which fully paid for 51 shares of Riggs' stock. This stock had been reserved and it was held in the treasury by Riggs. Under the original stock purchase agreements, it was provided that if Riggs should be reorganized and its business acquired by another corporation, a successor corporation would have the right to assume the contract and substitute its stock in the place of the Riggs' stock originally reserved under the stock purchase agreements. It is true that by acceptance of Riggs's letters dated February 14, 1950, each original stock purchase contract was canceled and terminated, but new agreements were made after February 14, 1950, taking the place of the original agreements, under which each employee's right to a specified number of fully paid shares of Riggs was determined, the amount of cash to be received (representing payment of the unused part of the credits to each employee after applying the credits to the number of shares of Riggs for which the credits would make full payment) by each employee was determined, and each employee agreed to receive in full settlement of his rights to such fully paid stock 8½ shares of Bausch & Lomb stock, plus the specified cash, for each share of fully paid Riggs' stock. This arrangement between Riggs and its 16 employees, 4 of whom were entitled to receive only cash, was accepted by Bausch & Lomb as part of the so-called reorganization plan of March 1, 1950, on the basis of substituting Bausch & Lomb stock for the Riggs' stock to which the employees were entitled, and that stock was delivered to Riggs to deliver to the 12 employees. This arrangement was in line with one of the provisions of the original stock purchase agreements which was to the effect that if the business of Riggs should be reorganized the successor corporation would have the right to substitute its own stock in the place of Riggs's reserved for the employees of Riggs. Petitioner simply assumed Riggs's obligation to its 16 employees, represented by the new agreements under Riggs's proposal letter of February 14, 1950. The acceptance of that proposal of Riggs by the employees constituted a new contract under which the employees' rights to fully paid stock of Riggs was recognized and

fixed. There was in no respect, by intent or affirmative action, any assignment by the employees involved of their rights to receive Riggs' stock to petitioner. Petitioner, for example, did not pay any of the employees in cash an amount equal to the credits they had earned which fully paid for 51 shares of Riggs' stock. The employees did not execute any assignment to petitioner of their rights to receive fully paid shares of Riggs. Although the 51 shares of reserved stock of Riggs was not first issued to the 12 employees, they were recognized as entitled to receive such stock of Riggs and no more was done than to satisfy their rights by giving them, in substitution, 433 shares of petitioner's stock. Throughout all of the minutes of both Riggs and petitioner of the meetings at which resolutions were adopted and authorizations were given, the outstanding shares of Riggs' stock were always stated to be 12,412 shares, and it was always stated that of that number, petitioner owned 9,923¼ shares. The rest, 2,488¾ shares, were owned by unnamed minority stockholders exclusive of the 12 employees whose credits gave them rights to 51 shares of Riggs' stock which were held in the treasury and were only "reserved" for them.

Petitioner has failed to prove that it owned at least 80 per cent of Riggs' stock. Petitioner is bound by what in fact was done, and it cannot now claim that it acquired 51 shares of Riggs' stock under a theory which finds no support in fact. It is concluded that petitioner did not own, prior to the liquidation of Riggs, more than 79.9488 per cent of Riggs' voting stock, and that there was not a "complete liquidation" of Riggs within the specifications of section 112 (b) (6).

It is held that section 115 (c) applies to the distribution received by petitioner in liquidation of Riggs, and that petitioner received assets of Riggs in exchange for its 9,923¼ shares of stock upon which it realized long-term capital gain. The respondent's determination is sustained.

There is another question whether, under sections 23 (s) and 122 (b) (2) (B), petitioner is entitled to deduct a net operating loss carryover from Riggs for the period January 1 to April 22, 1950, in the amount of $27,703.22.

Under the first question it has been held that there was a liquidation of Riggs rather than a reorganization. In this posture of the question, petitioner cannot avail itself of Riggs' net operating loss. *Patten Fine Papers, Inc.* v. *Commissioner*, 249 F. 2d 776, affirming on this question 27 T. C. 772; *Libson Shops, Inc.* v. *Koehler*, 353 U. S. 382; *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, 440, 441.

If the transaction involving Riggs was a reorganization, as petitioner contends, we would hold, following *Gramm Trailer Corporation*, 26 T. C. 689, that petitioner cannot carry over and deduct Riggs' net operating loss.

It is held that petitioner is not entitled to a deduction for carry-over of Riggs' net operating loss.

*Decision will be entered under Rule 50.*