EDGAR S. EVERHART JR., AND HELEN E. EVERHART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ASSOCIATED NAVAL ARCHITECTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Everhart v. Commissioner
Docket Nos. 11631-78, 11746-78.
United States Tax Court
T.C. Memo 1982-396; 1982 Tax Ct. Memo LEXIS 354; 44 T.C.M. (CCH) 459; T.C.M. (RIA) 82396; July 14, 1982. *354 Held: The sale of a shipyard by petitioner Edgar S. Everhart to petitioner Associated Naval Architects is to be respected for tax purposes. Held further: Marine railways, piers and wharves involved herein are properties described in section 1250 and thus the recapture provision of that section is to be applied. William P. McKeithan,Joseph C. Kearfott, and Robert S. Parker, Jr., for the petitioners. Michael R. Moore and John C. McDougal, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases respondent determined the following deficiencies: Petitioner(s)
Docket No.
Year
Deficiency
Edgar S. Everhart, Jr.
11631-78
1973
$324,430.20
and Helen E. Everhart
1974
8,974.28
Associated Naval
11746-78
9/30/73
13,608.07
Architects, Inc.
9/30/74
26,848.12
9/30/75
24,564.63
Due to an order granting a joint motion to sever an issue from the January 1980 trial of this case [1] *355 and to a concession, [2] the issues remaining for our determination are: (1) Whether an alleged sale of a shipyard, the Curtis Yard property, by petitioner Edgar S. Everhart to Associated Naval Architects, Inc. (ANA) should be respected for tax purposes or whether the purported sales price of the property contains a disguised dividend from ANA to the petitioner-shareholder; (2) If the sale of property is respected then we are called upon to determine whether certain marine railways, piers and wharves are properties described in section 1245[3] or whether section 1250 is applicable to these properties; *356 and (3) Whether petitioners are entitled to attorneys' fees. FINDINGS OF FACT Some of the facts have been stipulated. These fact together with the exhibits attached thereto are incorporated herein by this reference. Petitioners Edgar S. Everhart, Jr., and Helen E. Everhart were husband and wife residing in Virginia Beach, Virginia, at the time they filed their petition herein. They filed timely 1973 and 1974 joint Federal income tax returns with the Internal Revenue Service Center in Memphis, Tennessee. Helen E. Everhart is a party solely by virtue of her filing of joint returns with her husband. Petitioner Associated Naval Architects, Inc. (ANA), was a Virginia corporation with its principal place of business at Portsmouth, Virginia, at the time its petition was filed with this Court. ANA's Federal income tax returns for its taxable years ended September 30, 1973, September 30, 1974 and September 30, 1975 were tiely filed with the Internal Revenue Service Center in Memphis, Tennessee. These returns were filed reflecting use of a combined accrual and completed *357 contract method of accounting. Petitioner Edgar S. Everhart (hereinafter Everhart), along with a partner, began business in 1946 as a manufacturer of small pleasure boats. This enterprise was commenced on a 2.5 acre parcel of waterfront land facing the western branch of the Elizabeth River in West Norfolk (now Portsmouth), Virginia. In 1948 Everhart and his partner incorporated ANA and transferred to it all of the assets of the boat manufacturing business. Everhart became president of ANA and has served in that capacity at all times relevant to this proceeding. From 1968 to 1973 Everhart was Chairman of the Board of Directors of ANA. In the early 1950's, ANA expanded its operations to include ship repair and maintenance. To this end, ANA constructed and placed in operation a 200 ton capacity marine railway. The railway, which includes one or more large wooden cradles which rests on rails, is used to move a vessel onto dry land, thus exposing the vessel's hull for appropriate repair. A 6.67 acre tract that adjoined the ANA property was owned and operated as a shipyard during most of the 1950's by Curtis-Dunn Marine Industries, Inc. (Curtis-Dunn). The tract was improved by various *358 buildings, piers, wharves, marine railways and other improvements. This tract along with its improvements is hereinafter referred to as Curtis Yard. Sometime prior to 1959, Curtis-Dunn received a loan from American National Bank that was guaranteed by the Small Business Administration (SBA). Curtis Yard was conveyed by Curtis-Dunn by deed of trust as security for the loan. On February 6, 1959 there was an outstanding balance on the loan of $225,000. On that date Curtis-Dunn was adjudicated a bankrupt. In January of 1959 ANA acquired an option to buy Curtis-Dunn. The option was never exercised owing to ANA's inspection of Curtis-Dunn's financial records which revealed the corporation's insolvency. Seaborn J. Flournoy (Flournoy), a business acquaintance of Everhart in the late 1950's, was a businessman and investor. Flournoy and his wife together with another married couple, owned all of the stock of Flournoy-Moorman Corporation (Flournoy-Moorman). As of early 1959, Flournoy-Moorman had substantial investment income. Flournoy-Moorman wished to increase its income attributable to the rental of real estate in order to avoid classification as a personal holding company. Flournoy *359 was aware of the Curtis-Dunn bankruptcy and of ANA's interest in the business use of Curtis Yard. Shortly after the Curtis-Dunn bankruptcy, ANA, through Everhart, and Flournoy-Moorman, through Flournoy, reached an oral agreement concerning Curtis Yard. Flournoy-Moorman agreed to purchase Curtis Yard and to lease it to ANA for a 15-year term. Flournoy-Moorman was to front a minimum of $150,000 which would be used to purchase Curtis Yard. If the property could be acquired for less than $150,000 then Flournoy-Moorman would purchase the property and invest in capital improvements to the property so as to raise its total investment in the Curtis Yard to $150,000. ANA was to pay annual rent to Flournoy-Moorman in an amount equal to 10 percent of Flournoy-Moorman's investment. Furthermore, ANA would be responsible for repairs and improvements to the property (except for improvements made possible by the Flournoy-Moorman's initial investment) and ANA would have the right to purchase the property during the last 6 years of the lease. Such right, if not exercised by ANA prior to the end of the lease, would ripen into ANA's obligation to purchase the property at the end of the lease. The *360 purchase price to ANA, whether by right or obligation, was to be $150,000. Finally, it was agreed that Flournoy-Moorman would make a loan to ANA repayable in redeemable ANA stock and that Flournoy would become a director of ANA. During the course of the Curtis-Dunn bankruptcy proceeding Curtis Yard was advertised and offered for sale. At an auction on May 26, 1959 Flournoy-Moorman bid $206,500 for the property but the SBA's bid of $225,000 (an amount equal to the SBA's mortgage deficiency) prevailed. Subsequently, the SBA advertised the property for sale inviting sealed bids to be opened on September 10, 1959. The sole bid was received from ANA in the amount of $157,600. The SBA rejected the bid. Owing at least in part on the somewhat deteriorated character of Curtis Yard, ship repair businesses other than ANA showed little interest for Curtis Yard. Thus, on December 1, 1959, the date upon which the SBA held its second auction for the sale of Curtis Yard, the sole bid was that of Flournoy-Moorman for $115,000. The SBA, sensing the lack of interest in the property and realizing the necessity to beef up security at Curtis Yard through the winter months, deemed it prudent to accept *361 the bid and rid itself of the burdens attending maintenance of the property. Pursuant to its oral agreement, Flournory-Moorman supplemented its $115,000 investment for the purchase of Curtis Yard with $35,000 for certain improvements and repairs necessary to place the property in operating condition. The oral agreement was reduced to writing through execution of the following documents: (a) A lease agreement under which Flournoy-Moorman leased Curtis Yard to ANA for a term slightly in excess of 15 years ending December 31, 1974 at an annual rental of $15,000. (b) An agreement under which Flournoy-Moorman agreed to sell Curtis Yard to ANA at any time between January 1, 1968 and January 1, 1974 for $150,000. ANA was required to buy the property no later than January 1, 1974 for $150,000, payable in equal annual installments over at least 5 but not more than 10 years. (c) An agreement pursuant to which Flournoy-Moorman would loan ANA $1,400 quarterly for 5 years, with interest at 6 percent per annum. The loans were to be repaid on January 2, 1965 in ANA stock that was redeemable at book value out of ANA's retained earnings. ANA also agreed to elect Flournoy as one of its directors. *362 After execution of the lease, ANA made the repairs necessary to get Curtis Yard into operation and the property was used as an integral part of ANA's business of repairing and maintaining marine vessels. ANA's use of Curtis Yard together with the employment of its own contiguous property formed, quite naturally, the basis of a unified shipyard operation. From 1959 through 1973 approximately 80 percent of ship repair performed by ANA was accomplished at Curtis Yard. On October 4, 1966 Flournoy-Moorman sold Curtis Yard to Mr. and Mrs. Flournoy for $135,000 subject to the agreements between Flournoy-Moorman and ANA. On August 30, 1962 ANA had 452 shares of stock oustanding whose ownership was divided as follows: Edgar S. Everhart
388 shares
Williard O. Forbes
29 shares
William S. Havens
24 shares
S. J. Flournoy
5 shares
W. D. Barton
6 shares
For the period 1960 through 1967, the gross income and after tax profits and losses of ANA from the operation of its business (excluding income from the operation of a subsidiary and certain extraordinary income) were as follows: Fiscal Years Ended
Gross Sales
Net Profit (Loss)
9/30/60
$920,133.76
$1,807.56 9/30/61
756,790.52
(113,803.38)
9/30/62
1,191,145.28
62,037.72 9/30/63
1,171,977.18
24,216.64 9/30/64
986,055.91
17,001.07 9/30/65
1,289,293.06
23,284.24 9/30/66
1,151,312.07
20,992.52 9/30/67
1,728,163.43
81,806.50 In *363 order to meet working capital needs for the years 1961-1968, ANA found it necessary to obtain short-term bank loans. To secure the loans, ANA frequently assigned receipts from its business contracts to banks. A summary of loans made to ANA in those years follows: Fiscal Year Ended
Total Amount Borrowed
9/30/61
$485,000
9/30/62
90,000
9/30/63
95,000
9/30/64
30,000
9/30/65
270,000
9/30/66
175,000
9/30/67
9/30/68
140,000 In 1963 ANA purchased the National Welding Supply Company (National Welding) for $29,000. This purchase was made so as to afford ANA a fertile source of wholesale industrial gases and welding equipment. Additionally, the terms of purchase were extremely favorable to ANA. National Welding proved to be a progressively profitable operation throughout the 1960's. In 1967 ANA reaped a profit of $20,199 from the operations of its subsidiary, National Welding. The profits from National Welding for 1968 and 1969 were $24,027 and $29,405 respectively. Approximately 95 percent of ANA's business in the mid 1960's was derived from United States government contracts for slip repair. Due to the insecurities attending Congressional appropriations for vessel repair and ANA's inability to attract *364 private commercial business, the financial outlook for ANA's ship repair business was unclear in the late 1960's. Additionally, difficulties with its employees' union and an ANA warehouse fire in early 1968 contributed to the company's uncertain financial picture. In late 1967 ANA anticipated the need to make considerable capital improvements on the marine railways. Such improvements were necessary for Navy recertification and to increase the capacity of the railways so that ANA could be more competitive in its quest for repair work of large vessels. In late 1967 Flournoy indicated to Everhart that he wanted to divest himself of Curtis Yard. Flournoy was willing to sell the property to ANA under the terms of the 1959 option. Additionally, Flournoy was amendable to a sale of Curtis Yard to Everhart for the $150,000 price cited in the option which ANA possessed. Everhart, as president of ANA since 1948, was intimately familiar with the ship repair business. Curtis Yard had a value in excess of the $500,000 in 1968. Having an awareness that Flournoy wished to part with Curtis Yard, in early 1968 Everhart consulted his banker, Stockton H. Tyler (Tyler), then a senior vice president *365 of Seaboard Citizens National Bank (now United Virginia Bank). Everhart asked whether Tyler felt that Everhart, in his individual capacity, should purchase Curtis Yard, rather than having ANA purchase the property. Tyler's response was that it would be preferable if Everhart purchased the property and leased it to ANA and that the bank would lend Everhart funds for this purpose. Tyler believed that any debt incurred by ANA for the purchase of the property would reflect negatively on its financial statement. In light of ANA's need to borrow substantial sums of money from the bank to meet operating expenses, Tyler thus advised against an ANA purchase. On December 28, 1967 Everhart indicated to his attorney that he intended to purchase Curtis Yard for the $150,000 price cited in the 1959 agreement between Flournoy-Moorman and ANA and that the transaction would be financed by a local bank. Additionally, Everhart stated that he would enter into a 10-year lease arrangement with ANA whereby ANA would use Curtis Yard pursuant to the same rental terms and conditions as existed under Flournoy-Moorman's lease with ANA. In view of the prospective failure of ANA to exercise its option, the *366 attorney advised that consent to the proposed action be secured from all stockholders of ANA. On April 1, 1968 the stockholders and directors of ANA ratified Everhart's proposed action. The consent included a provision whereby ANA's option to purchase Curtis Yard was cancelled or transferred by ANA to Everhart. On April 1, 1968 ANA deeded to Everhart all of its interest in Curtis Yard thereby releasing its option to purchase the property. Flournoy sold Curtis Yard to Everhart for $150,000. The sale was consummated through delivery of a deed dated March 28, 1968 and through execution of a bill of sale from Seaborn J. and Georgia T. Flournoy to Edgar S. Everhart, dated April 1, 1968. On April 1, 1968, Everhart borrowed the full purchase price of $150,000 from Seaboard Citizens National Bank. On the same date he leased Curtis Yard to ANA for an annual rental charge of $15,000. The lease was substantially the same as ANA's prior lease with Flournoy-Moorman except that the term of the lease commenced on April 1, 1968 and was to end on March 31, 1978. At the time of his acquisition of Curtis Yard, Everhart had no definitive plans for future disposal of the property. After Everhart *367 purchased Curtis Yard he increased his personal liability insurance from $100,000 to $1 million so as to protect himself against any claim which might arise out of his ownership of Curtis Yard. For the fiscal years 1968 through 1973, ANA made the following expenditures respecting its own property and Curtis Yard: Maintenance
Fiscal Year
and
Capital
Ending September 30
Repair
Expenditures
Total
1968
$ 46,658
$ 74,209
$120,867
1969
47,182
107,197
154,379
1970
38,416
11,655
50,071
1971
47,695
15,710
63,405
1972
49,861
47,640
97,501
1973
68,494
58,571
127,065
Total
$298,306
$314,982
$613,288 Of the totals listed above, approximately $240,000 was for maintenance and repair of Curtis Yard and $250,000 was for capital expenditures relating to the Yard. Additionally, in the years 1962 through 1967 ANA expended in excess of $110,000 on Curtis Yard. The capital improvements made by ANA to Curtis Yard during the fiscal years 1968 through 1973 included rebuilding of the compressed air and electrical distribution systems and rebuilding and upgrading of waterfront improvements, including the marine railways. Under the terms of lease agreement between Everhart and ANA all alterations, additions and improvements to Curtis Yard became *368 the property of the lessor, Everhart. During the period 1968-1973 ANA secured new major commercial clientele which lessened its reliance on government contracting. This work proved more profitable than government work as evidenced by the following summary of ANA's shipyard business gross sales and profits and losses: (See supra p. 8 for a comparable summary for the years 1960-1967.) (Amounts shown below do not include ANA's net income from its wholly owned unconsolidated subsidiary, National Welding Supply Company.) Fiscal Year
Gross Sales
Net Profit (Loss)
1968
$1,663,834
$62,746 1969
2,134,569
70,318 1970
1,949,549
(2,701)
1971
1,267,382
19,952 1972
1,719,283
74,503 1973
2,259,650
101,053  As of September 30, 1973 ANA had not declared a dividend to its shareholders since its incorporation. For the years 1968 and 1969 ANA borrowed significant sums of money for working capital. After 1969 ANA no longer borrowed money for its working capital. In addition to increases in its gross sales and net profits, ANA's financial status was greatly improved by its sale in 1970 of its subsidiary, National Welding Supply Company, for $300,000. A satisfactory sale of ANA's subsidiary could not be accomplished *369 prior to 1970. Everhart's plan to sell Curtis Yard to ANA was formulated sometime in 1972. Everhart was certainly aware of the tremendous value of Curtis Yard and he needed a purchaser so that he could cash in on the investment he made in the Yard's acquisition in 1968. With ANA's shipyard business expanding and considering that ANA had been searching for investment possibilities, it appeared that ANA would be the most logical purchaser of Curtis Yard. Everhart was advised by his accountant that if he wanted to sell Curtis Yard to ANA, he should divest himself of enough stock in ANA so as to reduce his ownership of ANA below 80 percent in order to secure capital gains treatment on the sale of depreciable property. [4]
On September 26, 1973 ANA had 446 shares of stock issued and outstanding whose ownership was divided as follows: Edgar S. Everhart
388 shares
Willard O. Forbes
29 shares
William S. Havens
24 shares
S. J. Flournoy
5 shares
On September 27, 1973 Everhart gave 28 shares of ANA stock to St. Christopher's Episcopal Church and 8 shares to each of his four children. Thus, the ownership of the 446 shares of ANA stock wad divided as follows after Everhart's transfer: *370 Edgar S. Everhart
328 shares
Willard O. Forbes
29 shares
William S. Havens
24 shares
Seaborn J. Flournoy
5 shares
Katherine E. Paull
8 shares
Anne E. Bradley
8 shares
Brandt C. Everhart
8 shares
James E. Everhart
8 shares
St. Christopher's
Episcopal Church
28 shares
By deed dated September 28, 1973, Edgar S. and Helen E. Everhart conveyed Curtis Yard to ANA. The price for the property was $750,750. ANA transferred $150,750 to Everhart and issued a promissory note for $600,000, payable in eight annual installments of $75,000. Interest on the unpaid balance was calculated at 4 percent per year. The directors of ANA approved ANA's acquisition of the property from Everhart in a formal document entitled "Consent of Directors of Associated Naval Architects, Incorporated." On September 28, 1973 Curtis Yard had a fair market value of no less than $750,750. On September 30, 1973 ANA had unappropriated retained earnings of at least $680,554.54. From the date of its incorporation in 1948 through its fiscal year ended September 30, 1973 ANA did not pay a dividend to its shareholders. From 1968 to 1973 Everhart was president and treasurer of ANA. Willard O. Forbes was vice president of ANA and William S. Havens *371 was its secretary. Both Forbes and Havens were minority shareholders. On January 11, 1972, the Board of Directors of ANA adopted a resolution that upon the death or retirement of Forbes or Havens, their stock in ANA would be redeemed. Stock purchase agreements were executed the following October. ANA stock owned by Everhart was not subject to a purchase agreement. On his 1973 return, petitioner reported the transfer of Curtis Yard (including buildings, marine railways, piers, wharves, machinery and land) as an installment sale on which he reported capital gain, section 1231 gain, and certain ordinary income. His computation of the gain was as follows: Buildings
Gross Sales Price 09/28/73
97,405.00
Cost              03/28/68
36,199.00
Less Depreciation Allowed
14,429.72
Adjusted Basis
21,769.28
Plus Net Selling Expenses
97.43
21,866.71
Profit
75,538.29
Gross Sales Price
97,405.00
Less Allowable Mortgage Assumption
0.00
Seller's Equity
97,405.00
Percent of Profit = Profit/Equity = 77.551%
Collections This Year
19,558.85
Times Percent of Profit
77.551
Reportable Income
15,168.08
Deferred Profit, December 31, 1973
60,370.21
Ordinary Income % = 2.96% of Profit on Sale
Reportable Ordinary Gain
2,238.38
Reportable Long-Term 1231 Gain
12,929.70
Buildings
Gross Sales Price 09/28/73
35,027.00
Cost              03/28/68
13,017.00
Less Depreciation Allowed
8,641.32
Adjusted Basis
4,375.68
Plus Net Selling Expenses
35.04
4,410.72
Profit
30,616.28
Gross Sales Price
35,027.00
Less Allowable Mortgage Assumption
0.00
Seller's Equity
35,027.00
Percent of Profit = Profit/Equity = 87.408%
Collectio s This Year
7,033.39
Times Percent Of Profit
87.408
Reportable Income
6,147.74
Deferred Profit, December 31, 1973
24,468.54
Ordinary Income % = 2.15% of Profit on Sale
Reportable Ordinary Gain
658.29
Reportable Long-Term 1231 Gain
5,489.45
Marine Railway
Gross Sales Price 09/28/73
372,672.00
Cost              03/28/68
37,707.00
Less Depreciation allowed
28,260.96
Adjusted Basis
9,446.04
Plus Net Selling Expenses
372.78
9,818.82
Profit
362,853.18
Gross Sales Price
372,672.00
Less Allowable Mortgage Assumption
0.00
Seller's Equity
372,672.00
Percent of Profit = Profit/Equity = 97.365%
Collections This Year
74,832.24
Times Percent of Profit
97.365
Reportable Income
72,860.41
Deferred Profit, December 31, 1973
289,992.77
Ordinary Income % =.67% of Profit on Sale
Reportable Ordinary Gain
2,445.15
Reportable Long-Term 1231 Gain
70,415.26
Piers & Wharves
Gross Sales Price 09/28/73
106,832.00
Cost              03/28/68
7,541.00
Less Depreciation Allowed
5,652.35
Adjusted Basis
1,888.65
Plus Net Selling Expenses
106.86
1,995.51
Profit
104,836.49
Gross Sales Price
106,832.00
Less Allowable Mortgage Assumption
0.00
Seller's Equity
106,832.00
Percent of Profit = Profit/Equity = 98.132%
Collections This Year
21,451.78
Times Percent of Profit
98.132
Reportable Income
21,051.06
Deferred Profit, December 31, 1973
83,785.43
Ordinary Income % =.46% of Profit on Sale
Reportable Ordinary Gain
489.03
Reportable Long-Term 1231 Gain
20,562.03
Machinery
Gross Sales Price 09/28/73
84,985.00
Cost              03/28/68
39,900.00
Less Depreciation Allowed
20,560.84
Adjusted Basis
19,339.16
Plus Net Selling Expenses
85.04
19,424.20
Profit
65,560.80
Gross Sales Price
84,985.00
Less Allowable Mortgage Assumption
0.00
Seller's Equity
84,985.00
Percent of Profit = Profit/Equity = 77.144%
Collections This Year
17,064.92
Times Percent of Profit
77.144
Reportable Income
13,164.56
Deferred Profit, December 31, 1973
52,396.24
Ordinary income % = 31.36% of Profit on Sale
Reportable Ordinary Gain
13,164.56
Land
Gross Sales Price 09/28/73
53,829.00
Cost              03/28/68
15,636.00
Less Depreciation Allowed
0.00
Adjusted Basis
15,636.00
Plus Net Selling Expenses
53.85
15,689.85
Profit
38,139.15
Gross Sales Price
53,829.00
Less Allowable Mortgage Assumption
0.00
Seller's Equity
53,829.00
Percent of Profit = Profit/Equity = 70.852%
Collections This Year
10,808.82
Times Percent Of Profit
70.852
Reportable Income
7,658.26
Deferred Profit, December 31, 1973
30,480.89
Reportable Long-Term 1231 Gain
7,658.26
*372 Marine Railways, Piers and Wharves
Much of ANA's ship repair and modification business dealt with the repair of deteriorating vessels and vessel parts. Additionally, governmental regulation would necessitate certain changes and repairs to vessel parts. On occasion, ANA, pursuant to an owner's specifications, would adapt a vessel for a specific oceanic purpose, such as deep sea diving. These adaptations did not constitute a general overhaul of ships. The marine railways, piers and outfitting wharf situated on Curtis Yard were essential appurtenances to ANA's ship repair business. The outfitting wharf was necessary in order to work on large vessels. Marine railways were required by ANA to gain access to the hull of a ship for its repair and maintenance. The construction of marine railways is effected by driving pilings into the ground to a depth sufficient to support a weight of 15 long tons per pile. Railway logs are then set on pile caps. A steel flatbar is then affixed on top of the logs. Roller frames are set upon the track logs so that cradles may move freely to transport a vessel to and from the water. The cradles are pulled up and down the rails by chains, motors and *373 other gear of the marine railway. A vessel is moved onto a cradle while the cradle is submerged in the water.The cradle is then pulled onto dry land, thereby exposing the vessel's hull. With the use of marine railways to bring vessels to drydock, ANA was able to perform services including cleaning and painting of the underwater areas of vessels, checking outboard bearings and propellers and maintaining and repairing vessel cooling systems. ANA often removed sections of the hull plating and replaced it along with replacing vessel machinery such as engines, pumps and generators.ANA had machinists who evolved special bolts and very heavy nuts out of bar stock so as to aid in the repair machinery. Any deteriorated pipes or valves in vessels systems relating to waste, lubrication and fresh water were repaired by ANA. Inutile sewage tanks were replaced by ANA through use of one of the following supply sources: (1) customers sometimes furnished the tanks, (2) ANA purchased tanks and (3) ANA constructed the tank which was then installed pursuant to the customer's specifications. ANA's business of making repairs and modifications and maintaining boats, barges and harbor vessels has remained *374 essentially the same throughout the years relevant to this proceeding. Depreciation deductions taken by Everhart on marine railways, piers and wharves and the manner in which he treated the gain on these Curtis Yard assets are detailed above. During fiscal year ended September 30, 1978 ANA incurred expenses for dredging around the marine railways and claimed on its tax return an investment tax credit for the dredging. In his notice of deficiency dated July 20, 1978 sent to petitioners Edgar S. Everhart, Jr., and Helen E. Everhart, respondent determined, as a result of an alleged "sham sale" of Curtis Yard that the excess of the purchase price ($750,750) over Everhart's cost ($150,000), i.e. $600,750, was to be treated as a dividend to Everhart in 1973. Respondent determined in the alternative that if the sale of Curtis Yard was bona fide then an adjustment in the character of the gain reported by Everhart was required. Such an adjustment is attributable to respondent's view that marine railways, piers and wharves are section 1245 property and are not, as petitioner urges, section 1250 assets. [5] *375 In his notice of deficiency dated July 20, 1978 sent to Associated Naval Architects, Incorporated, respondent reduced the amount of depreciation deductions allowable to the corporation. This reduction is based on the theory that Everhart's sale to the corporation was a "sham" and accordingly the $750,750 cost basis assigned to the Curtis Yard assets should not be respected. Rather, respondent calculated depreciation deductions by assigning a $150,000 cost basis to Curtis Yard.[6]
OPINION The principal issue herein concerns an alleged sale of Curtis Yard by Everhart to *376 ANA. Everhart was, at all times relevant to this proceeding, the majority stockholder of ANA. The facts are set out in detail in our findings and will be repeated here only when necessary. The dispute emerges from the fact that on April 1, 1968 ANA, which was leasing Curtis Yard from Flournoy from 1959 through 1968, surrendered its right under the leasing arrangement to purchase Curtis Yard. Concurrently, Everhart purchased the property from Flournoy for $150,000. Everhart entered into a leasing arrangement with ANA which in essence was indistinguishable from the corporation's arrangement with Flournoy. On September 28, 1973 Everhart sold Curtis Yard to ANA for $750,750. Respondent's position is that this purported sale was a sham transaction which should not be respected for tax purposes. The Government reasons that Curtis Yard was absolutely essential to the success of ANA's shipyard business operation and that Everhart intended all along to convey the property to ANA. Respondent argues that but for one exception, on September 28, 1973 Everhart and ANA were in the identical position vis a vis Curtis Yard that they would have been had ANA exercised its option to purchase *377 Curtis Yard from Flournoy. That exception involves the alleged sale which, according to respondent, permitted Everhart to siphon off $600,750 of ANA's retained earnings in the form of capital gains in lieu of dividends. Section 301 and section 316 provide that any distribution of money or property made by a corporation to its shareholders with respect to its stock is a dividend to the extent of corporate earnings and profits. Section 301 is applicable only to property distributed by a corporation to a shareholder in his capacity as a shareholder. Section 1.301-1(c), Income Tax Regs.
The longstanding principle that the substance of a transaction and not its form controls tax liability is involved herein. See Gregory v. Helvering,293 U.S. 465 (1935); Minnesota Tea Co. v. Helvering,302 U.S. 609 (1938); Yamamoto v. Commissioner,73 T.C. 946 (1980), affd. in unpub. opinion 672 F.2d 924 (9th Cir. 1982). Courts have frequently applied the step transaction doctrine so as to elevate substance over form. See e.g. Helvering v. Alabama Asphaltic Limestone Co.,315 U.S. 179 (1942); Crenshaw v. United States,450 F.2d 472 (5th Cir. 1971); Kimbell-Diamond Milling Co. v. Commissioner,14 T.C. 74 (1950), *378 affd. per curiam 187 F.2d 718 (5th Cir. 1951); Bausch & Lomb Optical Co. v. Commissioner,30 T.C. 602 (1958), affd. 267 F.2d 75 (2nd Cir. 1959). The doctrine of substance over form has also been expressed through an analysis of the business purpose of the particular transactional form employed by the taxpayer. See e.g. Gregory v. Helvering,supra;West Coast Marketing Corp. v. Commissioner,46 T.C. 32 (1966).
Respondent's condemnation of Everhart's capital gain treatment (and installment sale election) of the sale of Curtis Yard commences with an allegation that there was no bona bide sale. He submits that ANA, with Everhart as its majority stockholder, president, and chairman of its board of directors, was the alter ego of Everhart. Although frequently avoiding a detailed discussion of the step transaction doctrine, respondent expresses his argument as follows: Everhart resorted to a step transaction to gain favorable tax treatment.Three steps were involved: (1) Everhart's acquisition of Curtis Yard in 1968 at a "ridiculously cheap" price, with knowledge that ANA was going to expend considerable sums of money to make capital improvements to the property; (2) in the years 1968-1973 *379 Everhart caused ANA to make substantial capital improvements to Curtis Yard; and (3) the sale of Curtis Yard to ANA at a substantially appreciated price, once the capital improvements had been completed and the corporation had demonstrated its earning potential. Thus, respondent alleges that Everhart, at the time of his purchase of Curtis Yard in 1968, had already devised a plan wherein his sale, years hence, of Curtis Yard to ANA was a certainty. [7]
Respondent buttresses his argument by alleging that it was not until ANA utilized Curtis Yard as an integral part of its operation that ANA had the potential to be a profit-making enterprise. The fact that Everhart's salary from ANA provided his livelihood is also highlighted by respondent. He reasons that Everhart's investment motive in acquiring Curtis Yard coupled with the fact that his salary was derived from ANA establish that Everhart had a preconceived plan to cash in *380 on his investment only through ANA's eventual purchase of the property. Despite respondent's allegation that a step transaction was involved herein, he does not address the most salient feature of the step transaction theory, i.e. the disregard of purposeless intervening steps. Respondent does not explicitly ask us to ignore the 1968 sale of Curtis Yard from Flournoy to Everhart.Rather, respondent argues that dealings between ANA and Everhart were not at arm's length and consequently payments from ANA to Everhart in 1973 should be viewed as distributions of corporate earnings, masquerading as something that might produce more beneficial tax consequences. Thus, respondent maintains that of the $750,750 purchase price paid by ANA, $600,750 should be dividends to Everhart and $150,000 should constitute ANA's cost for the property. Respondent so contends even in the face of his concession that the fair market value of Curtis Yard was at least equal to the price paid by ANA for the property. Considering the posture of the argument and respondent's concession concerning the value of Curtis Yard, respondent's assertion that Everhart's sale to ANA was a sham does not specifically propose *381 any explanation as to how and when Curtis Yard was transferred to ANA at a cost of $150,000. There is no specific mention that in 1968 Everhart made an express promise or was under any obligation to transfer Curtis Yard to ANA. Nor is it specifically argued that ANA was the actual purchaser of the property in 1968 for $150,000 and that Everhart was a mere conduit. Cf. Commissioner v. Court Holding Co.,324 U.S. 331 (1945) (where corporation negotiated a sale of a building and then was liquidated and erstwhile shareholders then formally contracted for the sale of the building it was held that the corporation was the actual seller); Palmer v. Commissioner,44 T.C. 92 (1965) (where shareholders contracted to sell real property and received part payment therefore and 2 days later the property was transferred to their corporation to carry out the sales contract with the purchaser, we held that the sale was to be ascribed to the shareholders). Respondent has stipulated herein that Everhart's acquisition of Curtis Yard in 1968 was a purchase. To hold for respondent herein would be tantamount to construing the above stipulation to mean that Everhart's acquisition, although a purchase, *382 was meaningless. Inasmuch as the fact that parties are not free to stipulate conclusions of law, Rose Ann Coates Trust v. Commissioner,55 T.C. 501, 511 (1970), affd. 480 F.2d 468 (9th Cir. 1973); Davis v. Commissioner,241 F.2d 701 (7th Cir. 1957), we do not find ourselves constrained by the stipulation. Yet, we find that the parties' factual stipulation that Everhart's acquisition was a purchase does comport with the legal realities which flow from the label "purchase." "Taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed." Corliss v. Bowers,281 U.S. 376, 378 (1930). Where there is a transaction with economic substance which is compelled or encouraged by business realities, is imbued with tax independent considerations and is not shaped solely for tax avoidance features that have meaningless labels attached the transaction must be respected. Lyon Co. v. United States,435 U.S. 561 (1978). Furthermore, where the transactional form employed evidences economic realities it is of no moment that a different but equally feasible form would have resulted in a greater tax. Gregory v. Helvering,supra.
The burden of proving *383 that respondent's determination herein is erroneous is upon petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a); Tax Court Rules of Practice and Procedure. We hold that petitioners have sustained their burden. In 1968 there was significant uncertainty as to ANA's future prosperity. Despite its banner year in 1967, the vagaries of ANA's financial fortunes are highlighted by its 1962 shipyard operation profit which was in excess of $62,000 and its average profit of about $21,000 for the next 4 years. Additionally, labor union difficulties plagued ANA during the 1960's. Furthermore, approximately 95 percent of ANA's business in the mid-1960's was derived from United States Government contracts for ship repair. Due to insecurities attending Congressional appropriations for vessel repair and ANA's inability to attract private commercial business, the financial outlook for ANA's ship repair operation was unclear in the late 1960's. In fact, the growing success of ANA's wholly-owned subsidiary, National Welding Supply Company, posed the possibility that if ANA's shipyard operation would falter, greater emphasis on the operation of the subsidiary could eventuate so as to *384 provide Everhart and other corporate employees with a livelihood. It is with this perspective that Everhart entered into the purchase agreement with Flournoy for Curtis Yard. We believe that at such time Everhart might very well have contemplated the possibility of a future sale to ANA if the corporation proved successful. We are equally certain, however, that Everhart was also aware of the potential downfall of ANA. It is perhaps because of this perception that Everhart wanted to acquire Curtis Yard in his individual capacity. For even if ANA were to falter, Everhart could then salvage through sale at least a portion of the benefits of his tremendous bargain purchase of 1968. Thus while we believe that Everhart, as a sophisticated businessman, entertained a host of possibilities, we are unable to accept respondent's contention that Everhart devised any definitive plan to sell Curtis Yard to ANA. We are equally unpersuaded that ANA's project of capital improvements somehow proves the existence of Everhart's certain scheme to sell Curtis Yard. For even if there was a careful plan to erect improvements, we are unwilling to accept respondent's implicit assumption that erection *385 of improvements will necessarily result in a highly prosperous business. While the installment of these improvements was intended to bolster ANA's standing in the competition for large private commercial business, respondent seems to ignore the risk factor inherent in any business venture. ANA, with its history of increasing and decreasing profits, was not exempt from risk. Respondent argues that Everhart bore none of the burdens of ownership of Curtis Yard. We perceive the situation somewhat differently. Everhart borrowed $150,000 from Seaboard Citizens National Bank to purchase Curtis Yard. While the rent paid by ANA to Everhart would cover all annual loan payments required of Everhart, Everhart was still required to make the balloon payment of $78,750 to the bank in 1973.While it is also clear that the lease arrangement between Everhart and ANA mandated that ANA carry $300,000 of insurance under the lease, Everhart increased his insurance up to $1 million to protect himself against liability claims arising out of the use of the property. Thus, we believe that there were elements of economic reality associated with Everhart's acquisition of Curtis Yard. We further note that *386 ANA borrowed significant sums of money in 1961-1968 to meet its operating expenses. There is no suggestion in the record that Seaboard Citizens National Bank would definitely not have loaned money to ANA for the 1968 purchase of Curtis Yard. However, when bank officials were asked whether ANA or Everhart should purchase Curtis Yard from Flournoy, the bank advised that Everhart be the purchaser. This advice was based on the bank's preference that one of its loan customers which was borrowing heavily to meet operating needs should not be investing in fixed assets. What is of crucial significance in our decision is the time factor involved between the date of Everhart's purchase of Curtis Yard in April of 1968 and his sale of the property to ANA in September of 1973. This 5-1/2 year period lends itself readily to a rejection of respondent's claim that in 1968 Everhart had a definitive intent to sell the property to ANA in the future. The time frame also evidences the fact that risks borne by Everhart were in fact meaningful rather than merely incidental and short lived. Respondent acknowledges that it is unique to find that a shareholder's entire profit resulting from an alleged *387 transfer to his closely held corporation constitutes dividend distributions when that transfer was for a price at least equal to the fair market value of the transferred asset. However, we are, in essence, urged by respondent in this instance to depart from the usual considerations of the fair market value of the property transferred because of the particular circumstances herein. Respondent relies heavily in Goldstein v. Commissioner,T.C. Memo. 1960-276, affd. 298 F.2d 562 (9th Cir. 1962), in support of his contention. In that case the taxpayer was the dominant shareholder of a closely held corporation. The corporation held a long-term lease on a parcel of property used in its business. As evidenced by corporate minutes, the corporation desired to own the property so as to be in a better position to procure a loan and increase its working capital. The board of directors authorized corporate officers to negotiate for the purchase of the land. Subsequently, the board decided that the taxpayer would purchase the property in his individual capacity and perhaps at some future time would sell it to the corporation. Through a series of transactions the taxpayer acquired the property *388 on December 8, 1953 for $35,000. On December 31, 1953 the taxpayer sold the property to his corporation for $75,000.The contention that the taxpayer received a $40,000 dividend from his corporation was upheld by this Court. Respondent maintains that Goldstein is analogous to the instant case. We disagree. First, respondent suggests that even though there was some evidence that the property involved had a fair market value of $75,000, "that did not dissuade the Court from finding that Goldstein's profit was really a disguised dividend." Respondent misapprehends the Court's view of the facts. While there was testimony of an appraiser who opined that the property was worth about $79,000, the Court noted that there was no satisfactory explanation of the effect on value of the corporate lease which still had 42 years to run. Observing that the taxpayer himself would not pay more than $35,000 for the property because of its attending lease, we implicitly rejected the notion that the corporation paid the price of a willing buyer with no compulsion to purchase. In fact, on appeal the Ninth Circuit recognized that the taxpayer "sold it at a price in excess of what the most persuasive *389 evidence shows was the fair market value." Goldstein v. Commissioner, 298 F.2d at 567.
Second, the corporation, which expressed an intent to acquire the property, purchased the property from the taxpayer just 23 days after its acquisition by the taxpayer. It is thus by no means surprising that the Court viewed the $40,000 profit as not reflective of the worth of the property but rather as a dividend distribution. Respondent states that the taxpayer's dominance over his corporation in Goldstein was the chief factor leading to the Court's conclusion. Our reading of the case reveals that such dominance is a factor which invites careful scrutiny but is not in and of itself a proper basis for disregarding the particular transactional form employed. For the reasons noted above we hold that Everhart's sale of Curtis Yard to ANA 5 1/2 years after his purchase of the property was a bona fide sale to be respected for tax purposes. Marine Railways, Piers and Wharves
On his 1973 and 1974 income tax returns Everhart allocated the proceeds received from the sale of Curtis Yard to the various assets of Curtis Yard. Gain on marine railways, piers and wharves was reported as section 1250 gain *390 (ordinary income component) and section 1231 gain. Respondent argues that the marine railways, piers and wharves are section 1245 assets. Thus, respondent, in view of the greater depreciation recapture required by section 1245 than that required by section 1250, maintains that a greater portion of the gain on these assets should be reported as ordinary income. Section 1250(c) provides that the term "section 1250 property" means any real property (other than section 1245 property, as defined in section 1245(a)(3)) which is or has been property of a character subject to the allowance for depreciation provided in section 167. The parties agree that the relevant marine railways, piers and wharves were subject to a depreciation allowance. Accordingly, the dispute is focused upon the definition of section 1245 property as found in section 1245(a)(3). Respondent's argument centers on section 1245(a)(3) (particularly section 1245(a)(3)(B)(i)) which provides in relevant portion: (3) Section 1245 property.--For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in *391 section 167 (or subject to the allowance of amortization provided in section 185) and is either-- (A) personal property, (B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property) -- (i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *. In defining property described in section 1245(a)(3)(B), section 1.1245-3(c)(2), Income Tax Regs., directs our attention to the regulations promulgated under the investment tax credit provisions. [8] *392 Section 1.48-1(d)(2), Income Tax Regs., provides: (2) Manufacturing, production, and extraction. For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of the soil, the raising of livestock, and the mining of minerals. Thus, section 38 property would include, for example, property used as an integral part of the extracting, processing, or refining of metallic and nonmetallic minerals, including oil, gas, rock, marble, or slate; the construction of roads, bridges, or housing; the processing of meat, fish, or other foodstuffs; the cultivation of orchards, gardens, or unrseries; the operation of sawmills, the production of lumber, lumber products or other building materials; the fabrication or treatment of textiles, paper, leather goods, *393 or glass; and the rebuilding, as distinguished from the mere repairing, of machinery. Respondent contends that the marine railways, piers and wharves were used an integral part of ANA's manufacturing business. More specifically, he maintains that because it was sometimes necessary during ship repair for ANA to manufacture certain replacement parts, such as bushings for propellers, special nuts and bolts and other parts, ANA was in the manufacturing business.In addition, respondent asserts that modifications to vessels effected by ANA so as to adapt vessels to another use is evidence of the existence of a ship rebuilding business as distinguished from ANA's routine repair business. We sustain petitioner on this issue. ANA was in the business of repairing and maintaining vessels. In fact, respondent has so stipulated before trial, and only upon brief does he seek to expand the boundaries of ANA's business.Even so, the merits of respondent's contention are dubious. The adaptation of vessels, on occasion, for certain specific occeanic purposes involved only the addition of certain appurtenances so as to accommodate the specific purpose. No major ship overhaul was effected. Thus, *394 we cannot view these occasional adaptations as constituting a ship rebuilding business. Nor does it appear to us that modification of vessels arising from government regulation constitutes ship rebuilding.As a typical case, government regulation mandated that ships effect changes in sewage disposal. Thus, ANA inserted holding tanks after attending to sewage pipes. We do not perceive such efforts as falling under the heading of ship rebuilding. While we are aware that there exists a fine line between the repairing and rebuilding of vessels, we simply dno not believe that the level of activity undertaken by ANA may be elevated to the category of ship rebuilding.
Respondent also notes ANA's "manufacture" of nuts and bolts, bushings for propellers, and other parts from raw stock. Suffice it to say that activity leading to the evolution of these parts was necessary to effect ship repair and did not amount to a manufacturing business in and of itself. Finally, respondent points to the fact that ANA claimed an investment credit in the fiscal year ended September 30, 1978 for dredging around the marine railways. Thus, respondent continues, ANA must have concluded that the marine railways *395 were used an integral part of manufacturing in that year. See section 48(a)(1)(B)(i). Everhart urges that in light of respondent's audit of his 1973 and 1974 returns the credit was claimed on the 1978 corporate return to prevent a "whipsawing" effect.
The 1978 tax year of ANA is not before us and the matter of ANA's claimed credit for 1978, in our view, sheds no light on whether ANA was in the manufacturing or rebuilding business. We find Everhart's "whipsaw" contention plausible. Yet even if it were entirely incredible, we do not believe in this instance, that what ANA returned in 1978 governs the propriety of Everhart's 1973 and 1974 claims. Petitioners' prayer for attorneys' fees must be rejected as this Court is not empowered to grant such fees to petitioners. McQuiston v. Commissioner,78 T.C. 807 (1982). To reflect the foregoing, Decisions will be entered for the petitioners.
Footnotes
1. During the years in issue petitioner Edgar S. Everhart was a limited partner in four limited partnerships involved in rehabilitating and renting low income housing. Partnership losses claimed by petitioner were reduced or disallowed in their entirety by respondent. For judicial economy and in view of a realistic possibility of settlement of this issue the parties moved to sever it from the January 1980 trial of this case. The motion was granted as reflected in the Court's order of December 19, 1979. 2. One of the principal issues in this case concerned the fair market value of the Curtis Yard property. This shipyard property was allegedly sold by the petitioner Edgar S. Everhart to Associated Naval Architects, Inc. on September 28, 1973. Although a great portion of the trial was directed to this issue respondent subsequently conceded the issue. See respondent's brief, p. 3, 29.↩
3. All statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue.↩
4. See section 1239.↩
5. Respondent's alternative determination was premised on the notion that the fair market value of Curtis Yard on September 28, 1973 was $205,000. Subsequent to trial respondent conceded that the value of Curtis Yard on the date it was sold by Everhart was at least equal to the sales price of $750,750. Accordingly, it is not purposeful to reproduce respondent's computation underlying its recharacterization of alleged section 1250 gain as section 1245↩ gain.
6. Respondent's alternative determination is his notice of deficiency which assigns a cost of $205,000 to Curtis Yard is no longer appropriate in view of respondent's concession that the property was worth at least $750,750 on the date of its sale to ANA.↩
7. Respondent's apparent reluctance to discuss the step transaction doctrine at any length in his briefs is due perhaps to his stipulation that the 1968 transfer of Curtis Yard to Everhart from Mr. and Mrs. Flournoy was indeed a purchase of the property by Everhart.↩
8. Section 48 defines what property is subject to the investment credit allowed by section 38. Section 48(a)(1)(B) specifically qualifies for the credit certain tangible property "used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water or sewage disposal services." The quoted words are also employed in section 1245(a)(3)(B)(i) and thus section 1.1245-3(c)(2) refers us to section 1.48-1(d)(2)↩ for a definition of the identical phrase.